UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

BRIAN DAVID ROGERS,

    Plaintiff,

v.

COMMISSIONER OF SOCIAL
SECURITY,

    Defendant,
_____/

Case No. 1:16-cv-1245

HON. JANET T. NEFF

## OPINION

Plaintiff brings this action under 42 U.S.C. § 405(g) seeking judicial review of a final decision by the Commissioner of the Social Security Administration (Commissioner). Plaintiff seeks review of the Commissioner's decision denying his claim for disability insurance benefits (DIB) under Title II of the Social Security Act. Section 405(g) limits the Court to a review of the administrative record, and provides that if the Commissioner's decision is supported by substantial evidence, it shall be conclusive.

## STANDARD OF REVIEW

The scope of judicial review in a social security case is limited to determining whether the Commissioner applied the proper legal standards in making her decision and whether there exists in the record substantial evidence supporting that decision. *See Brainard v. Sec'y of Health & Human Servs.*, 889 F.2d 679, 681 (6th Cir. 1989). The Court may not conduct a *de novo* review of the case, resolve evidentiary conflicts, or decide questions of credibility. *See Garner v. Heckler*, 745 F.2d 383, 387 (6th Cir. 1984). It is the Commissioner who is charged with finding the facts relevant to an application for disability benefits, and her findings are conclusive provided they

are supported by substantial evidence. *See* 42 U.S.C. § 405(g).

Substantial evidence is more than a scintilla, but less than a preponderance. *See Cohen v. Sec'y of Health & Human Servs.*, 964 F.2d 524, 528 (6th Cir. 1992) (citations omitted). It is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion. *See Richardson v. Perales*, 402 U.S. 389, 401 (1971); *Bogle v. Sullivan*, 998 F.2d 342, 347 (6th Cir. 1993). In determining the substantiality of the evidence, the Court must consider the evidence on the record as a whole and take into account whatever in the record fairly detracts from its weight. *See Richardson v. Sec'y of Health & Human Servs.*, 735 F.2d 962, 963 (6th Cir. 1984). The substantial evidence standard presupposes the existence of a zone within which the decision maker can properly rule either way, without judicial interference. *See Mullen v. Bowen*, 800 F.2d 535, 545 (6th Cir. 1986) (citation omitted). This standard affords to the administrative decision maker considerable latitude, and indicates that a decision supported by substantial evidence will not be reversed simply because the evidence would have supported a contrary decision. *See Bogle*, 998 F.2d at 347; *Mullen*, 800 F.2d at 545.

**PROCEDURAL POSTURE**

Plaintiff was thirty-nine years of age on the date of the ALJ's decision. (PageID.38, 106.) He completed highschool and was previously employed as a tractor-trailer operator, general laborer, and as a small products assembler. (PageID.96.) Plaintiff applied for benefits on June 17, 2013, alleging disability beginning May 8, 2011, due to degenerative disc disease, scoliosis, osteoarthritis of the hips and joints, depression, suicidal ideation, spinal fusion of the L5 and S1 vertebrae, neck pain, and bipolar disorder. (PageID.106–107, 177–178.) Plaintiff's application was denied on July 24, 2015, and Plaintiff subsequently requested a hearing before an ALJ.

(PageID.122–127.) On May 21, 2015, Plaintiff appeared with his counsel before ALJ Daniel Dadabo for an administrative hearing at which time Plaintiff and a vocational expert (VE) both testified. (PageID.64–104.) On July 24, 2015, the ALJ issued an unfavorable written decision that concluded Plaintiff was not disabled. (PageID.38–64.) On September 7, 2016, the Appeals Council declined to review the ALJ's decision, making it the Commissioner's final decision in the matter. (PageID.31–35.) Plaintiff subsequently initiated this action under 42 U.S.C. § 405(g).

Plaintiff's insured status expired on March 31, 2015. (PageID.106.) To be eligible for DIB under Title II of the Social Security Act, Plaintiff must establish that he became disabled prior to the expiration of his insured status. *See* 42 U.S.C. § 423; *Moon v. Sullivan*, 923 F.2d 1175, 1182 (6th Cir. 1990).

**ALJ'S DECISION**

The social security regulations articulate a five-step sequential process for evaluating disability. *See* 20 C.F.R. § 404.1520(a-f).[1] If the Commissioner can make a dispositive finding at any point in the review, no further finding is required. *See* 20 C.F.R. § 404.1520(a). The regulations

---

[1]
1.  An individual who is working and engaging in substantial gainful activity will not be found to be "disabled" regardless of medical findings (20 C.F.R. § 404.1520(b));

2.  An individual who does not have a "severe impairment" will not be found "disabled" (20 C.F.R. § 404.1520(c));

3.  If an individual is not working and is suffering from a severe impairment which meets the duration requirement and which "meets or equals" a listed impairment in Appendix 1 of Subpart P of Regulations No. 4, a finding of "disabled" will be made without consideration of vocational factors (20 C.F.R. § 404.1520(d));

4.  If an individual is capable of performing work he or she has done in the past, a finding of "not disabled" must be made (20 C.F.R. § 404.1520(e));

5.  If an individual's impairment is so severe as to preclude the performance of past work, other factors including age, education, past work experience, and residual functional capacity must be considered to determine if other work can be performed. (20 C.F.R. § 404.1520(f)).

3

also provide that if a claimant suffers from a nonexertional impairment as well as an exertional impairment, both are considered in determining the claimant's residual functional capacity (RFC). *See* 20 C.F.R. § 404.1545.

Plaintiff has the burden of proving the existence and severity of limitations caused by his impairments and that he is precluded from performing past relevant work through step four. *Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 474 (6th Cir. 2003). At step five, it is the Commissioner's burden "to identify a significant number of jobs in the economy that accommodate the claimant's residual functional capacity (determined at step four) and vocational profile." *Id.*

ALJ Dadabo determined that Plaintiff's claim failed at the fifth step of the evaluation. At step one, the ALJ found that Plaintiff did not engage in substantial gainful activity between his alleged disability onset date and his date last insured. (PageID.43.) At step two, the ALJ determined that through his date last insured, Plaintiff had the severe impairments of lumbar stenosis and spondylosis, with a history of March 2003 L5-S1 fusion secondary to degenerative disc disease and herniation; bilateral hip arthritis; obesity; bi-polar disorder; anxiety disorder, NOS; and personality disorder. (PageID.44.) At the third step, the ALJ found that during the relevant time period Plaintiff did not have an impairment or combination of impairments that met or equaled the requirements of the Listing of Impairments. (PageID.44–46.) At the fourth step, the ALJ determined Plaintiff retained the RFC based on all the impairments, through his date last insured:

> to perform sedentary work as defined in 20 CFR 404.1567(a), subject to only occasional balancing, stooping, kneeling, crouching and crawling, occasional ramps and stairs, no ladders, ropes or scaffolds, no unprotected heights, heavy equipment or operating machinery, no public contact, no work in coordination with others, only occasional interaction with co-workers and supervisors, the need to work generally alone, and work which requires only simple decision-making involving tasks that are routine and which stay the same day-

4

to-day.

(PageID.46.) Continuing with the fourth step, the ALJ found that Plaintiff was unable to perform any of his past relevant work. (PageID.56.) At the fifth step, the ALJ questioned the VE to determine whether a significant number of jobs exist in the economy that Plaintiff could perform given his limitations. *See Richardson*, 735 F.2d at 964. The VE testified that Plaintiff could perform other work as a final assembler (31,000 national positions), as a visual inspector (26,200 national positions), and as a sorter (16,000 national positions.) (PageID.97–102.) Based on this record, the ALJ found that Plaintiff was capable of making a successful adjustment to work that exists in significant numbers in the national economy. (PageID.73.)

Accordingly, the ALJ concluded that Plaintiff was not disabled from June 17, 2013, the alleged disability onset date, through March 31, 2015, the date last insured. (PageID.58.)

## DISCUSSION

On December 22, 2016, the Court filed a Notice that directed the filing of briefs in this case. Among other things, the Court stated that "Plaintiff's initial brief . . . must contain a Statement of Errors, setting forth in a separately numbered section, each *specific* error of fact or law upon which Plaintiff seeks reversal or remand." (PageID.683) (emphasis added.) Plaintiff's brief provides only a generic statement of errors, alleging that the Commissioner failed to give appropriate weight to the medical experts, violated agency rules, failed to provide a fair and full hearing, and misapplied the law. (PageID.691.) The Court therefore must frame the issues for review.[2] After examining Plaintiff's brief, the Court gleans the following issue: The ALJ erred in assigning little

---

[2] Plaintiff's counsel is cautioned that future briefs failing to provide a Statement of Errors containing specific alleged errors may be stricken.

weight to the opinion of Dr. Ron Melvin, D.O.[3] For reasons expressed below, however, this claim does not merit relief.

## 1. Dr. Melvin's Opinion.

On December 19, 2013, Dr. Ron Melvin, D.O., completed a mental medical source statement responding to prepared questions about Plaintiff's abilities. The doctor noted that he had been treating Plaintiff for several months and had diagnosed him with bipolar disorder and a personality disorder. (PageID.457.) Plaintiff's current GAF score was sixty and his highest score in the past year had been 60-65.[4] (PageID.457.) The doctor indicated Plaintiff's prognosis was guarded. (PageID.457.) Still, the doctor commented that Plaintiff's speech was logical and coherent. His judgment and insight were stable and he was oriented times three.[5] (PageID.457.)

The doctor went on to note that Plaintiff demonstrated several signs and symptoms.

---

[3] To the extent Plaintiff may have raised other claims, the Court finds them to be brief allusions at best. As such, they have been waived. "'Issues adverted to in a perfunctory manner, unaccompanied by some effort at developed argumentation, are deemed waived. It is not sufficient for a party to mention a possible argument in the most skeletal way, leaving the court to . . . put flesh on its bones.'" *United States v. Stewart*, 628 F.3d 246, 256 (6th Cir. 2010) (quoting *McPherson v. Kelsey*, 125 F.3d 989, 995–96 (6th Cir. 1997)); *see United States v. Elder*, 90 F.3d 1110, 1118 (6th Cir. 1996); accord *Curler v. Comm'r of Soc. Sec.*, 561 F. App'x 464, 475 (6th Cir. 2014) ("[P]laintiff develops no argument to support a remand, and thus the request is waived.").

[4] The Global Assessment of Functioning or "GAF" score is a subjective determination that represents "the clinician's judgment of the individual's overall level of functioning" on a hypothetical continuum of mental health-illness. AMERICAN PSYCHIATRIC ASSOC., DIAGNOSTIC AND STATISTICAL MANUAL OF MENTAL DISORDERS (DSM-IV-TR), (4th ed., text rev., 2000), pp. 32, 34. The GAF score is taken from the GAF scale, which rates individuals' "psychological, social, and occupational functioning," and "may be particularly useful in tracking the clinical progress of individuals in global terms." *Id.* at 32. The GAF scale ranges from 100 to 1. *Id.* at 34. At the high end of the scale, a person with a GAF score of 100 to 91 has "no symptoms." *Id.* At the low end of the GAF scale, a person with a GAF score of 10 to 1 indicates "[p]ersistent danger of hurting self or others (e.g., recurrent violence) OR persistent inability to maintain minimal personal hygiene OR serious suicidal act with clear expectation of death." *Id.* A GAF score of 60 indicates that Plaintiff had "[m]oderate symptoms (e.g., flat affect and circumstantial speech, occasional panic attacks), or moderate difficulty in social, occupational, or school functioning (e.g., few friends, conflicts with peers or co-workers)." DSM–IV–TR at 34 (capitalization and boldface omitted). A GAF score of 65 indicates "some mild symptoms (e.g. depressed mood and mild insomnia) or some difficulty in social, occupational, or school functioning (e.g., occasional truancy, or theft within the household), but generally functioning pretty well, has some meaningful interpersonal relationships.) *Id.* (capitalization and boldface omitted).

[5] The Court was unable to decipher some of the doctor's handwritten notations in this statement.

6

Among them the doctor noted Plaintiff experienced a pervasive loss of interest in almost all activities, decreased energy, thoughts of suicide, feelings of guilt or worthlessness, persistent anxiety, persistent disturbances of mood or affect, change in personality, seclusiveness or autistic thinking, emotional withdrawal, motor tension, emotional liability, manic syndrome, inappropriate suspiciousness, memory impairment, a sleep disturbance, and involvement in activities with painful consequences. (PageID.458.)

The doctor then checked boxes which indicated his opinion of the severity of Plaintiff's restrictions in twenty-five categories encompassing the areas of the abilities and aptitudes needed to do unskilled, semiskilled or skilled work, and those needed to do particular types of jobs. Of the twenty-five categories, the doctor indicated Plaintiff was unable to meet competitive standards in nineteen of them. He was seriously limited in five other categories, and was limited, but satisfactory, in only one category. (PageID.459–460.) The doctor twice failed to explain these limitations, but after commenting on Plaintiff's abilities to do particular jobs, the doctor noted that Plaintiff's depression had led to low energy as well as poor concentration and memory. He was not able to work a full day and could not concentrate nor remember well. Plaintiff felt others looked down on him and he was sensitive to that perceived criticism. Plaintiff also had emotional lability that would result in inappropriate behavior. (PageID.460.)

The doctor concluded that were he to work, Plaintiff would find many work demands stressful, and would likely be absent more than four days a month. (PageID.461.) The doctor indicated that these limitations had been present since approximately December 2011. (PageID.461.)

After summarizing the doctor's opinions, the ALJ gave them very limited weight, explaining that:

> It is internally inconsistent with Dr. Melvin's own treatment notes which show some improvement with medications. It is also inconsistent with Dr. Melvin's regular GAF scoring of 60-65 throughout the treatment records (Ex.'s 4F/19, 22F/50, 28F/5). According to the American Psychiatric Association's *Diagnostic and Statistical Manual of Mental Disorders* (DSM-IV-R) (4th Ed. Rev. 1994) at page 32, a GAF between between [sic] 51 and 60 indicates moderate symptoms or a moderate impairment in social, occupational, or school functioning. A GAF between 61 and 70 indicates some mild symptoms or some difficulty in social, occupational, or school functioning, but generally functioning pretty well and with some meaningful interpersonal relationships.

(PageID.56.) Plaintiff claims the ALJ's decision fails to pass muster under the treating physician doctrine.

### 2. The Treating Physician Doctrine Generally.

By way of background, the treating physician doctrine recognizes that medical professionals who have a long history of caring for a claimant and his maladies generally possess significant insight into his medical condition. *See Barker v. Shalala*, 40 F.3d 789, 794 (6th Cir. 1994). An ALJ must, therefore, give controlling weight to the opinion of a treating physician if: (1) the opinion is "well-supported by medically acceptable clinical and laboratory diagnostic techniques" and (2) the opinion "is not inconsistent with the other substantial evidence in the case record." *Gayheart v. Comm'r of Soc. Sec.*, 710 F.3d 365, 375–76 (6th Cir. 2013) (quoting 20 C.F.R. § 404.1527).

Such deference is appropriate, however, only where the particular opinion "is based upon sufficient medical data." *Miller v. Sec'y of Health & Human Servs.*, 1991 WL 229979 at *2 (6th Cir., Nov. 7, 1991) (citing *Shavers v. Sec'y of Health & Human Servs.*, 839 F.2d 232, 235 n.1

(6th Cir. 1987)). The ALJ may reject the opinion of a treating physician where such is unsupported by the medical record, merely states a conclusion, or is contradicted by substantial medical evidence. *See Cohen*, 964 F.2d at 528; *Miller*, 1991 WL 229979 at *2 (citing *Shavers,* 839 F.2d at 235 n.1); *Cutlip v. Sec'y of Health & Human Servs.*, 25 F.3d 284, 286–87 (6th Cir. 1994).

If an ALJ accords less than controlling weight to a treating source's opinion, the ALJ must provide "good reasons" for doing so. *Gayheart*, 710 F.3d at 376. Such reasons must be "supported by the evidence in the case record, and must be sufficiently specific to make clear to any subsequent reviewers the weight the adjudicator gave to the treating source's medical opinion and the reasons for that weight." *Id.* This requirement "ensures that the ALJ applies the treating physician rule and permits meaningful review of the ALJ's application of the rule." *Id.* (quoting *Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 544 (6th Cir. 2004)). Simply stating that the physician's opinions "'are not well-supported by any objective findings' and are 'inconsistent with other credible evidence'" is, without more, too "ambiguous" to permit meaningful review of the ALJ's assessment. *Id.* at 376–77.

If the ALJ affords less than controlling weight to a treating physician's opinion, the ALJ must still determine the weight to be afforded such. *Gayheart*, 710 F.3d at 376. In doing so, the ALJ must consider the following factors: (1) length of the treatment relationship and frequency of the examination; (2) nature and extent of the treatment relationship; (3) supportability of the opinion; (4) consistency of the opinoin with the record as a whole; (5) the specialization of the treating source; and (6) other relevant factors. *Id.* (citing 20 C.F.R. § 404.1527). While the ALJ is not required to explicitly discuss each of these factors, the record must nevertheless reflect that the

9

ALJ considered those factors relevant to his assessment. *See, e.g.*, *Oldham v. Astrue*, 509 F.3d 1254, 1258 (10th Cir. 2007); *Undheim v. Barnhart*, 214 F. App'x 448, 450 (5th Cir. 2007).

### 3. The ALJ's Decision Complies With the Treating Physician Doctrine.

The ALJ's observation that the doctor's extreme restrictions were not well supported in the doctor's own notes is well supported. Plaintiff was first seen by Dr. Melvin on June 6, 2013. (PageID.373.) Plaintiff reported depression, anxiety, and mood swings and connected much of these symptoms to his back pain. He reported occasional suicidal ideation, but noted the thoughts would go away when he was distracted. Despite these complaints, he reported he was not "doing too badly." Plaintiff told Dr. Melvin his medications helped him and he did not feel as bad as he had in the past. (PageID.373-374.) He also described adequate sleep and appetite, good energy and motivation, and adequate activity and enjoyment. (PageID.374.) The doctor conducted a mental status examination and found Plaintiff was:

> alert, cooperative and pleasant with good eye contact, adequate hygiene and grooming, casually dressed. No psychomotor agitation or retardation. Speech is logical, coherent and has goal direction. Mood is dysphoric. Affect is broad, potentially labile. Judgment and insight are fair. Cognition is grossly intact and he is oriented times three. No formal thought disorder, no delusions or hallucinations and no homicidal ideation or plan. Occasional infrequent suicidal ideation without intent or plan. No symptoms of psychosis.

(PageID.375.) The doctor diagnosed Plaintiff with bipolar disorder, anxiety disorder, and a personality disorder. (PageID.375.)

At the next visit, dated September 5, 2013, Plaintiff told Dr. Melvin that he had lost Medicaid and was unable to afford his medications. He reported that while he was taking his medications, he had been doing "much better." Despite the lack of medication, however, Plaintiff still denied any problems with sleep, and told the doctor his appetite was stable and that his energy

and motivation were adequate. A mental status examination was also identical to the previous visit and Plaintiff still had a GAF score of 60-65. (PageID.527–528.) The doctor gave Plaintiff a three-month supply of all his medications with four refills through the Med Access Program. (PageID.528.)

Two months later, on December 19, 2013, Plaintiff told Dr. Melvin he had stopped taking all his medications. Plaintiff reported weight gain and dizziness with the Depakote, and some jerky motions with the Cymbalta. Plaintiff also said he would lose his temper at times and had difficulty with concentration, attention and memory. He had mood swings, little enjoyment in his life, difficulty sleeping, and felt overwhelmed. (PageID.518.) Despite these increased complaints, an objective mental status examination conducted by the doctor remained largely similar to the previous two visits. Plaintiff was alert, cooperative, and pleasant with good eye contact, adequate hygiene and grooming. There was no psychomotor agitation or retardation. His speech was logical, coherent and he had goal direction. His mood was dysphoric and his affect was broad and potentially labile. His judgment and insight were fair, and his cognition grossly intact. Plaintiff was oriented times three with no formal thought disorder, delusions, or hallucinations. At this visit Plaintiff had occasional but infrequent suicidal ideation but no intent or plan. (PageID.518.) Plaintiff still had a GAF score of 60 to 65. (PageID.519.)

By May 1, 2014, Plaintiff appeared to be back on track. He told Dr. Melvin he was "doing pretty well" and reported that his moods had leveled out on new medication. He did not feel depressed, or irritable. He still slept well and had a good appetite. He also denied depression and anxiety, but described some lingering social anxiety around large groups. Plaintiff further reported maintaining good levels of energy, motivation, and activity. There were no hopelessness or helpless

feelings, and no suicidal ideation. Dr. Melvin described Plaintiff as cooperative and pleasant, and noted Plaintiff appeared stable and at baseline. (PageID.479.) The mental status examination remained largely the same. Plaintiff's mood was nearly euthymic and his GAF scores again were 60-65. (PageID.480.)

On September 4, 2014, Plaintiff reported periods where he was doing fairly well. He had continued mood swings, but stated his medication had helped control his anger. He still complained of social anxiety, but stated he was able to sleep adequately and had a stable appetite. Plaintiff told Dr. Melvin he had been swimming and snorkeling and he had lost weight, which had helped reduce his pain. Plaintiff admitted to some suicidal ideation since his last visit, but denied any current ideation. There were no hopeless or helpless feelings and the doctor found Plaintiff was fully oriented. Dr. Melvin went on to indicate Plaintiff was still stable, but not at his baseline. Plaintiff was exhibiting some mild to moderate distress. (PageID.617.) That saidl, Plaintiff's mental status examination was largely similar to previous examinations and his GAF scores remained at 60-65. (PageID.617–618.)

On January 15, 2015, the most recent visit in the record, Plaintiff reported that he was homeless and living with his aunt and uncle. He felt more frustrated and angry. He had experienced suicidal ideation without intent or plan. Still he felt he was sleeping well. His appetite, energy, and motivation also were all within normal limits. Plaintiff had no current suicidal ideation. As with the previous visit, Dr. Melvin remarked that Plaintiff was stable but not at his baseline. He was still experiencing some mild to moderate distress. (PageID.614.) Plaintiff's mental status examination was likewise similar to the previous test. It was noted Plaintiff's mood was perhaps mildly depressed and Plaintiff's GAF scores remained at 60-65. (PageID.615.)

The ALJ properly found these records were inconsistent with the extreme restrictions offered by Dr. Melvin. In many of these records, Plaintiff expressly denied experiencing the symptoms that the doctor would later mark on his opinion. The doctor's mental status examinations also fail to support his opinion. While they do not show that Plaintiff was unencumbered, they fail to indicate that Plaintiff was unable to function at a level consistent with the ALJ's conclusions. While the Court does not doubt that Plaintiff experiences a certain amount of pain from his physical impairments, and that such affects his mental capabilities, the limitations reflected in the doctor's treatment notes are adequately accounted for in the RFC. Accordingly, the Court finds the ALJ provided good reasons, supported by substantial evidence, for assigning less than controlling weight to Dr. Melvin's opinion. Plaintiff's claim of error is therefore denied.

## CONCLUSION

For the reasons articulated herein, the Court concludes that the ALJ's decision is supported by substantial evidence. Accordingly, the Commissioner's decision is **AFFIRMED.**

A separate judgment shall issue.


Dated: August 7, 2017              /s/ Janet T. Neff
                                   JANET T. NEFF
                                   UNITED STATES DISTRICT JUDGE